IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAI'I

| | |
|---|---|
| UNITED STATES OF AMERICA, | CR NO. 15-00242 DKW |
| Plaintiff, | |
| vs. | ORDER DENYING DEFENDANT ROMAN GABRIEL CONTRERAS' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS |
| ROMAN GABRIEL CONTRERAS, | |
| Defendant. | |

## ORDER DENYING DEFENDANT ROMAN GABRIEL CONTRERAS' MOTION TO SUPPRESS EVIDENCE AND STATEMENTS

Defendant Roman Gabriel Contreras ("Contreras") is charged with knowingly and intentionally attempting to possess with the intent to distribute five-hundred grams or more of a mixture or substance containing a detectable amount of methamphetamine, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). Dkt. No. 14. The charge stems from an investigation and subsequent March 24, 2015 arrest of Contreras at Lihue Airport on the island of Kaua'i.

Contreras moves to suppress the evidence seized by, and his statements made to, law enforcement on March 24 and 25, 2015. Dkt. No. 26; Dkt. No. 26-3. Contreras argues that (1) law enforcement lacked probable cause to arrest him and

to seize his one carry-on and two checked bags that accompanied him from Los Angeles to Lihue; (2) law enforcement lacked probable cause to obtain the search warrant for his bags that was issued by the Magistrate Judge on March 25, 2015; and (3) his statements to law enforcement at Lihue Airport were given in violation of *Miranda*. Dkt. No. 26-2 at 4-9.

Following briefing and an evidentiary hearing held across three days, the Court finds that the investigatory stop and subsequent arrest of Contreras was supported by reasonable suspicion and probable cause. The Court further concludes that the Magistrate Judge's decision to issue the search warrant for Contreras' bags, in which the methamphetamine was found, was likewise based on probable cause. Lastly, the Court concludes that Contreras' statements to law enforcement on March 24, 2015 at Lihue Airport were not given in violation of *Miranda*. Accordingly, Contreras' Motion to Suppress Evidence and Statements ("Motion to Suppress") (Dkt. No. 26) is DENIED.

## <u>BACKGROUND</u>

Contreras' Motion to Suppress came on for hearing before this Court on May 14, 2015, May 18, 2015, and June 1, 2015. Five witnesses testified: Drug Enforcement Agency ("DEA") Special Agent Richard Jones, Sergeant Danny Oliveira of the Kauaʻi Police Department, Task Force Officer Arnold Cayabyab of the Kauaʻi Police Department, Herbert Nakamura, and Defendant Contreras. The

witnesses presented testimony relating to a February-March 2015 drug investigation that originated with tips from two sources and culminated in the arrest of Contreras on March 24, 2015 at Lihue Airport.  Contreras' arrest occurred after airport surveillance in both Los Angeles and Lihue corroborated the law enforcement sources, and a narcotics detection dog, Simon, positively alerted to a narcotics odor emanating from one of Contreras' bags.

In carefully assessing the testimony of the witnesses, including the substance of the testimony as well as the demeanor and manner in which the witnesses testified, the Court finds the testimony of Special Agent Jones, Sergeant Oliveira, Officer Cayabyab, and Mr. Nakamura to be credible and consistent with the other evidence in the record as to material details.  The Court does not find credible those portions of Contreras' testimony that contradicted that of the law enforcement witnesses.  Specifically, Contreras hesitated in response to numerous questions on cross-examination and evasively responded to the government's questions regarding ownership of the bags.

Based upon its review of the evidence and the testimony presented at the hearing, the Court finds the following facts supported by the record.

## I.    <u>Initial Investigation</u>

During the months of February and March of 2015, the Kaua'i Police

Department obtained information from two different sources of a subject operating a black-colored tow truck on the east side of Kauaʻi dealing methamphetamine. The first source did not know the name of the subject, but described him as a person of Mexican descent with a tan complexion, approximately 5'05" tall, and having a "fat belly," a mustache, a beard, and long, shoulder length hair.[1] The source further reported that the Mexican male subject operated a black-colored tow truck, and that he paid women to travel to the mainland and bring back to Hawaiʻi up to $10,000 worth of methamphetamine.

A second source of information related that a subject by the name of "Roman Contreras" had been commuting between Los Angeles and Lihue[2] transporting methamphetamine using Delta Airlines or American Airlines. The Kauaʻi Police Department conducted a background check on "Roman Contreras" using Hawaii's statewide criminal history record information system (CJIS). The background check revealed that Contreras has an extensive criminal history, including at least one prior felony conviction for the possession of a controlled substance, and generated a photograph of Contreras that generally matched the first source's physical description. Subsequent law enforcement surveillance of Contreras prior to March 24, 2015 revealed that he operated a black-colored tow

---

[1] The Court finds that Contreras generally matches this description, with the exception of appearing somewhat taller than 5'05".

[2] Lihue is located on the east side of Kauaʻi.

truck and matched the general physical description contained in both Contreras'

CJIS photograph and in the information provided by source one.[3]

## II.   March 24, 2015 Airport Surveillance and Arrest

On March 24, 2015, the Kaua'i Police Department received information

from source two that Contreras would be transporting methamphetamine from Los

Angeles to Lihue that very day.  The second informant further stated that the

methamphetamine was contained in a black non-leather briefcase.  A check with

Delta Airlines revealed that Contreras was booked on Delta Flight 1735, with an

arrival time at Lihue Airport of approximately 8:35 p.m. on March 24.

That afternoon, Sergeant Oliveira conveyed this information to Special

Agent Jones.  After receiving this information and a photograph of Contreras at

LAX checking into his flight for Lihue, Special Agent Jones traveled to Lihue to

await Contreras' arrival.  Delta advised Special Agent Jones that Contreras had

checked two bags.

Law enforcement established surveillance at Lihue Airport.  Upon arrival of

Delta Flight 1735, Special Agent Jones observed Contreras exiting the jetway,

---

[3]Investigation into an outstanding bench warrant in an unrelated case led to a third informant positively identifying Contreras' CJIS photo and informing law enforcement that the black tow truck and the people operating it were engaged in drug sales activity.  Sergeant Oliveira was aware of this information from the third informant as of March 24, 2015, which can therefore be considered in evaluating the propriety of Contreras' stop and arrest.  *See United States v. Hall*, 974 F.12 1201, 1204 (9th Cir. 1992) (recognizing that the "collective knowledge of the officers involved, and the inferences reached by experienced, trained officers" are included in determining whether reasonable suspicion to justify an investigatory stop existed).

walking slowly towards baggage claim, and looking over his shoulder multiple times. According to Special Agent Jones, Contreras carried with him a black briefcase, which fit the description provided by one of the informants of the bag containing methamphetamine. Special Agent Jones approached Contreras near the Lihue baggage claim area, identified himself as a law enforcement officer, and asked Contreras if he could ask a few questions. It is undisputed that, at this time, Special Agent Jones advised Contreras that he was *not* under arrest and could leave at any time. When Special Agent Jones asked Contreras if he could see his driver's license and plane ticket, Contreras responded that he was in a hurry and attempted to walk away.[4] Special Agent Jones then advised Contreras that he was being detained and that a narcotics canine was going to examine his carry-on bag. As Special Agent Jones directed Contreras to a circular bench between curbside and baggage claim, Contreras allegedly stated that he wanted to invoke his Fifth Amendment rights.

Within a few minutes, Officer Cayabyab and his narcotics detection canine, Simon, arrived on scene. Officer Cayabyab and Simon had worked together as a unit for the Kaua'i Police Department since February 2008 and had completed quarterly trainings and successful annual certifications since that time. As recently as February 2015, Officer Cayabyab and Simon had been certified by Herbert

---

[4]According to Contreras, he had a tow truck job to which he needed to tend.

Nakamura, a certifying official for the California Narcotics Canine Association and the American Working Dog Association, as competent and reliable to detect the odor of methamphetamine (among other substances). Mr. Nakamura has carried out detection training for four of the police departments in the State of Hawaiʻi since 2008 and currently performs the annual certifications for the entire State of Hawaiʻi. The certification process required Officer Cayabyab and Simon to annually complete a blind test under controlled conditions, which involved successfully identifying as a team, without error, all of the hidden narcotic aids randomly placed in four different rooms and in several vehicles. Special Agent Jones had previous experience working with Officer Cayabyab and Simon and was aware of Simon's certification.

Sergeant Oliveira signaled to Special Agent Jones that Simon had positively alerted to Contreras' black carry-on bag. A few minutes earlier, Simon examined the two checked bags that were believed to belong to Contreras without alerting to the odor of narcotics.

After Simon positively alerted to the presence of narcotics in Contreras' carry-on, Special Agent Jones relayed this information to Contreras, informed him that he was being placed under arrest, and advised that law enforcement would be attempting to obtain search warrants for his bags. When Contreras claimed ignorance as to the bags Special Agent Jones intended to search, Special Agent

Jones pointed to the nearby area where Contreras' carry-on and two checked bags had been placed. Contreras denied that the two checked bags belonged to him. Special Agent Jones advised Contreras that his name was on the tags attached to both checked bags, but Contreras pointed out that the tags bore the name "Contrades," and not "Contreras."

While still at the airport, Special Agent Jones conducted a search incident to arrest and discovered a piece of paper in Contreras' wallet with his PNR record number, name, and Delta flight information. Special Agent Jones observed that the name on the piece of paper was "Gabriel Ramon Contrades." All three bags were then transported to the Kaua'i Police Department, pending the issuance of a warrant.

## III. <u>Search Warrant</u>

On March 25, 2015, the Government applied for a search warrant, including the supporting affidavit of Task Force Officer Kyle Echiberi. Def's Ex. A. Because a dog was utilized in the instant case, the Government also attached the affidavit of Officer Cayabyab, which detailed his and Simon's certifications and training since 2008. Dkt. No. 31-1 at 23-26. The Magistrate Judge approved the search warrant that same day. Def's Ex. C. Upon executing the search warrant, law enforcement discovered the methamphetamine referenced in the Indictment in

one of the two checked bags.  No methamphetamine was found in Contreras'
carry-on.

## DISCUSSION

In his Motion to Suppress, Contreras argues that (1) law enforcement lacked
probable cause to arrest him and seize the three bags; (2) the search warrant
approved by the Magistrate Judge was invalid because it was not based on
probable cause; and (3) his March 24, 2015 statements to law enforcement at Lihue
Airport were given in violation of *Miranda*.  As set forth below, the Court rejects
each of Contreras' arguments.

## I.    The Investigatory Stop and Subsequent Arrest of Contreras Was Supported by Reasonable Suspicion and Probable Cause

### A.    Investigatory Stop

Law enforcement officers may initiate an investigatory stop if they have
reasonable suspicion that a person is engaged in criminal activity.  *Terry v. Ohio*,
392 U.S. 1, 21 (1968).  To constitute reasonable suspicion, the officer's belief that
criminal activity is afoot must be supported by "specific and articulable facts
which, taken together with rational inferences from those facts, reasonably warrant
the intrusion."  *Id*.  The determination of whether reasonable suspicion exists is
made with reference to the collective knowledge of the officers involved, and the
inferences reached by experienced, trained officers.  *United States v. Hall*, 974
F.2d 1201, 1204 (9th Cir. 1992).  Reliable information from an informant may also

create reasonable suspicion and justify an investigatory stop. *See Alabama v. White*, 496 U.S. 325, 331-32 (1990). An officer may justify an investigatory stop based solely or substantially on an informant's tip, depending on its reliability. *United States v. Palos-Marquez*, 591 F.3d 1272, 1275 (9th Cir. 2010).

Here, there was reasonable suspicion to justify the investigatory stop on Contreras at Lihue Airport on March 24, 2015 based on the information from law enforcement sources, combined with the personal observations of and investigation by law enforcement. Special Agent Jones testified that on March 24, 2015, he took up a surveillance position at Lihue Airport after receiving information that Contreras was engaged in transporting methamphetamine from Los Angeles to Lihue, that Contreras was scheduled to be on a Delta Airlines flight from Los Angeles to Lihue on March 24, 2015, and that Contreras would be carrying methamphetamine in a specific type of bag. Although the sources of information to the Kaua'i Police Department were anonymous and their previous track record unknown to the DEA, specific information provided by the sources had been independently corroborated by surveillance and investigation prior to March 24, 2015. Specifically, Contreras' actual physical appearance closely matched the description provided by one of the informants; Contreras was seen driving a black tow truck that the sources associated with the sale of illegal narcotics; and law

enforcement confirmed that Contreras had a prior criminal history that included drugs.

Moreover, the additional tip received on March 24, 2015 was firmly rooted in time and place and was also corroborated by independent investigation. The informant indicated that Contreras was transporting methamphetamine from Los Angeles to Lihue and that the methamphetamine was in a black non-leather briefcase. A check with Delta Airlines corroborated that information—Contreras was booked on Delta Flight 1735, which departed Los Angeles and was scheduled to arrive at Lihue Airport at approximately 8:35 PM on March 24, 2015 and that Contreras had two checked bags. As such, the sources of information had up to that point proven to be reliable.

After Contreras' flight landed, Special Agent Jones observed Contreras exit the jetway and walk towards baggage claim. Special Agent Jones' observation of Contreras matched the description given by one of the informants and the photograph that he had received of Contreras. Special Agent Jones also observed that Contreras carried a black bag that fit the description provided by one of the informants as containing methamphetamine and that Contreras looked behind him at least eight times as he proceeded towards baggage claim. Special Agent Jones further observed a black tow truck arrive curbside, which he knew was a tow truck that Contreras had driven in the past. All of this information was far more than

enough to provide reasonable suspicion for Special Agent Jones to believe that Contreras was engaged in criminal activity. As such, the initial investigatory stop of Contreras was justified.

In addition, "[t]he scope of the detention must be carefully tailored to its underlying justification." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). The United States Supreme Court has stated:

> [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. It is the [Government's] burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

*Id.* (internal citations omitted); *see also United States v. Place*, 462 U.S. 696, 706 (1983).

Here, the Government proved that the initial stop of Contreras was both limited in scope and duration. It is undisputed that Special Agent Jones exchanged only a few words with Contreras upon initially stopping him. When Contreras attempted to leave, Special Agent Jones informed Contreras that he was being detained and that law enforcement was going to have a narcotics canine that was already on site examine his carry-on bag. Special Agent Jones did not touch Contreras, except to assist him with removing his carry-on bag, which had become

entangled with an article of Contreras' clothing. After being led to a bench by Special Agent Jones, Contreras waited for only a few minutes, at most, before Simon alerted to Contreras' carry-on bag. Thus, the investigative stop in the instant case was minimally intrusive. As set forth below, the dog alert, in conjunction with the other aforementioned events that had transpired, gave Special Agent Jones probable cause to then arrest Contreras.

**B. Contreras' Arrest**

Contreras argues that Special Agent Jones lacked probable cause to arrest him. In particular, Contreras challenges the reliability of the dog alert, which the Government concedes was necessary to establish probable cause for Contreras' arrest. The Court concludes that the dog alert was reliable and that based on the totality of the circumstances, Special Agent Jones had probable cause to arrest Contreras.

A warrantless arrest must be supported by probable cause. *Maryland v. Pringle,* 540 U.S. 366, 370 (2003). Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested. *Garcia v. County of Merced*, 639 F.3d 1206, 1209 (9th Cir. 2011). Under this objective standard, the government need not "show [] that the officer's belief is more likely true than false[,]" *United States v. Brobst*, 558

F.3d 982, 997 (9th Cir. 2009), and need not demonstrate "probable cause for every element of the offense." *Blankenhorn v. City of Orange*, 485 F.3d 463, 472 (9th Cir. 2007) (internal quotation marks omitted). Instead, the government must show that the officers had an objectively reasonable belief that Contreras had committed a crime, based on the totality of the relevant circumstances. *See Luchtel v. Hagemann*, 623 F.3d 975, 979 (9th Cir. 2010). Given the Government's concession at the hearing that the dog alert was necessary to establish probable cause for Contreras' arrest, the Court examines as a threshold matter whether Simon's alert was reliable.

A dog's reliability is established based on the totality of circumstances. *Florida v. Harris*, 133 S. Ct. 1050, 1055-58 (2013). In *Harris*, the United States Supreme Court addressed how courts should determine whether an alert from a drug-detection dog provides probable cause to search a vehicle when the defendant has challenged the dog's reliability. The Court instructed that in determining whether a dog is reliable, the question is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that a search would reveal contraband or evidence of a crime." *Id.* at 1058. Highly relevant to this inquiry is evidence of a dog's satisfactory performance in a certification or training program. *See id.* at 1057.

In the instant case, testimony at the hearing established that in controlled settings, Simon has performed reliably in drug detection scenarios, as evidenced by his successful annual certifications since 2008, a fact of which Special Agent Jones was aware. Specifically, as recently as February 2015, just weeks prior to the events challenged here, two bona fide organizations—the California Narcotics Canine Association and the American Working Dog Association—had certified Simon and Officer Cayabyab. *See id.* at 1057 ("If a bona fide organization has certified a dog after testing his reliability in controlled setting, a court can presume (subject to any conflicting evidence offered) that the dog's alert provides probable cause to search."). Mr. Nakamura gave detailed testimony regarding the controlled environment and the phases of the certification test that Simon and Officer Cayabyab successfully completed on an annual basis for the past seven years. Mr. Nakamura explained that to receive certification, Simon had to locate 0 to 2 "narcotics aids" in four separate rooms and in up to three separate vehicles without error, and that Simon had never failed his annual certification test. Mr. Nakamura further testified that a canine unit's certification test is the most important factor in determining a dog's reliability in detecting narcotics because the handler and canine are evaluated together in a controlled environment where the possibility of contamination is absent. Mr. Nakamura further explained that when an environment is not controlled, there may be drug residue that the dog can detect,

but law enforcement cannot. Officer Cayabyab testified that in addition to annual

certifications, he and Simon complete quarterly trainings together that are, in some

ways, even more challenging than certification. These trainings include narcotics

detection at different heights, in different locations, and secreted in different

media. Based on the totality of circumstances, the Court concludes that Simon's

alert to Contreras' carry-on bag on March 24, 2015 would make a reasonably

prudent person think that a search would reveal contraband or evidence of a crime.

Defense challenges to Simon's reliability, based on Simon's field

performance, are unpersuasive. In attempting to demonstrate that Simon is

unreliable, defense counsel pointed to alleged "error rates," which counsel

calculated using Simon's seizure logs for the period 2008 to 2015. *See* Def's Ex.

S. Defense counsel's methodology for calculating Simon's "error rates" involved

identifying the number of times Simon alerted to an item, but no narcotics were

found. Defense counsel also asked the Court to take judicial notice of an order

from the Third Circuit Court for the State of Hawai'i, CR. No. 10-1-1053, *State v.*

*Sullivan*, in which the state court found that "Simon has been wrong in more than

one-third of the search warrants that he previously indicated contained

contraband." Def.'s Ex. BB at 10.

These arguments are misplaced for several reasons. First, in 2013, the

Supreme Court specifically held in *Harris* that "in most cases," a drug-detection

dog's field performance has "relatively limited import" and that the better measure

of a dog's reliability comes from his performance in controlled testing

environments. *Id.* at 1056. In part, that is because, as indicated by Mr. Nakamura,

canines can detect drug residue, and therefore issue a positive alert, even where the

contraband is no longer present. Second, applying the framework set forth in

*Harris*, the same Judge who had previously determined Simon to be unreliable in

*Sullivan*, reached the opposite conclusion in *State v. Louis,* Cr. No. 13-1-0048. *See*

Gov't Ex. 4 at 13-14. Third, even taking into account Simon's field performance,

and defense counsel's own methodology, Simon's field performance in the most

recent and most relevant years—2013 to 2015—has shown insignificant "error

rates." In the 2013 through 2015 post-*Sullivan* period, Simon committed what

even defense counsel acknowledges is only one error in each respective year,

amounting to an "error rate" of approximately 3.3%, 3.8%, and 5.5% respectively.

Accordingly, even if this Court were to give credence to Simon's field

performance data and interpret it in the manner advanced by the defense, this

evidence supports the conclusion that on March 24, 2015, Simon was a reliable

narcotics detection dog.

Lastly, the Court rejects defense attempts to rely on the fact that Simon

failed to identify the bag in which the methamphetamine was actually found in the

instant case. Even though the methamphetamine was ultimately found in one of

the checked bags to which Simon did not alert, not the carry-on bag to which he did, "we do not evaluate probable cause in hindsight, based on what a search does or does not turn up." *Id.* at 1059.

For the foregoing reasons, including Simon's positive alert, and all of the evidence set forth above obtained by law enforcement on and prior to March 24, 2015, the Court concludes that there was probable cause to arrest Contreras.

## II.    The Search Warrant Was Supported By Probable Cause

In assessing probable cause for purposes of a search warrant, a magistrate judge must consider the facts and circumstances presented in the warrant application, including the supporting affidavit, in a practical, common-sense manner, and must find that "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). A reviewing court must evaluate a magistrate judge's decision to issue a warrant with great deference, only examining whether the magistrate judge had a "substantial basis" for concluding that probable cause existed. *Id.* at 238-39.

Contreras argues that the search warrant here lacked probable cause, primarily because the reliability and criminal history of the law enforcement sources were not disclosed in the search warrant affidavit. *See* Dkt. No. 26-2, Def's Mot. at 6-7. As previously mentioned, however, the totality-of-the-

circumstances analysis informs probable cause determinations.  As such, no one factor is dispositive of the issue.

Here, while source background was indeed absent from TFO Echiberi's affidavit, the information provided was evidently reliable based on its level of detail and specificity, consistency among sources, and independent corroboration by law enforcement.   One source gave a detailed description of the subject's physical appearance, which had been verified by prior surveillance and matched both Special Agent Jones' review of Defendant's CJIS photograph and observations of Contreras on March 24, 2015.  Another source specifically identified Defendant by name as a source of methamphetamine supply on Kaua'i.  There was also consistency between the sources, as both identified the subject as operating a black-colored tow truck.   Law enforcement corroborated additional information relayed by the informants.  Specifically, Contreras arrived in Lihue on a Delta flight that departed from Los Angeles and was seen carrying a bag that fit the description given by one of the informants as the bag containing methamphetamine.  In addition, the black tow truck described by the informants was spotted circling the airport at the time of the Delta flight's arrival.  In fact, Defendant acknowledges operating the truck and that it was present at the Lihue Airport on the evening of March 24 to pick him up.  Accordingly, there was sufficient information in the search warrant that rendered the informants reliable.

As to the reliability of the dog alert, for the reasons previously discussed, the Magistrate Judge correctly concluded that the totality of the evidence, including Simon's alert, provided the requisite probable cause. Specifically, the affidavit of Officer Cayabyab attached to the search warrant detailed the successful certifications of the Cayabyab/Simon unit by the California Narcotic Canine Association and the American Working Dog Association, as well as their history and regular training together since 2008.

For the foregoing reasons, the Court concludes that the Magistrate Judge had a "substantial basis" for concluding that probable cause existed and rejects Contreras' contentions to the contrary.

## III.   No *Miranda* Violation Occurred

Contreras argues that the statements he made to law enforcement at the Lihue Airport on March 24, 2015 were the product of custodial interrogation, and thus, subject to the protections of *Miranda v. Arizona*, 384 U.S. 436 (1966). The requirements imposed by *Miranda* were designed to safeguard a defendant's privilege against compulsory self-incrimination. *See Rhode Island v. Innis*, 446 U.S. 291, 297 (1980). In *Miranda*, "the Court concluded that in the context of 'custodial interrogation' certain procedural safeguards are necessary to protect a defendant's Fifth and Fourteenth Amendment privilege against compulsory self-incrimination." *Innis*, 446 U.S. at 297. *Miranda* warnings are required when two

conditions are met: (1) the defendant must be in custody; and (2) the defendant must be under interrogation.

Contreras asserts, and the Government does not deny, that he was in custody when he made the statements at issue, and that he had not at that point been read his *Miranda* rights. Even so, *Miranda* does not require suppression in this case because Contreras did not make the statements in response to interrogation. In *Innis*, the United States Supreme Court explained that "'[i]nterrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." *Id.* at 300. The term "interrogation" means "any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response[.]" *Id.* at 301. Voluntary statements are not considered the product of interrogation. *Miranda*, 384 U.S. at 478.

Contreras asserts that law enforcement informing him that they were going to obtain a search warrant for his bags and identifying the bags they intended to search were reasonably likely to elicit an incriminating response. However, as Special Agent Jones explained, his comments to Contreras were designed simply to inform him of law enforcement's intended next steps following Defendant's arrest. They are the type of comments "normally attendant to arrest and custody."

*Innis*, 446 U.S. at 301; Dkt. No. 31 at 19. In other words, Special Agent Jones'
undisputed, truthful statements simply alerted Contreras to what was going on and
what to expect. This type of "routine, matter-of-course statement cannot be
sufficiently compulsive to qualify as 'interrogation' under *Miranda*." *United
States v. Ellis*, 910 F. Supp. 2d 1008, 1024 (W.D. Mich. 2012). Accordingly, the
Court concludes that no *Miranda* violation occurred.

Because Contreras' statements were neither the product of an unlawful
arrest, nor improper interrogation, there is no basis for suppression.

## CONCLUSION

Contreras' Motion to Suppress (Dkt. No. 26) is hereby DENIED.[5]

IT IS SO ORDERED.

DATED: June 10, 2015 at Honolulu, Hawaiʻi.



Derrick K. Watson
United States District Judge

---

[5] The Court does not reach the Government's abandonment contention because probable cause
entitles the Government to the fruits of its March 25, 2015 search regardless of Contreras'
statements.